May it please the Court, my name is Kevin Dolly and I represent the appellants in this case Carl Carey and Champion Pro Consulting. There are two interconnected trial court orders that are before this court on appeal. The first involves what is the evidence in this case and the lack of evidence due to spoliation and what the trial court did in reference to that issue. The second is the ultimate facts and law that the court determined as it relates to the UDTPA claim before this court. I'd like to start by talking about the question of what is the evidence and what to do in relation to the spoliation question. Now, there is no doubt that under the law the trial court has broad discretion to determine what is the appropriate remedy to devise in relation to an issue or question of spoliation. However, I think that when you look at the finding of the trial court, which we do agree with, which is that there is a very high likelihood that the text messages that were destroyed would be highly probative to the questions in this case. And based on that being the determination of the trial court, before going through the ultimate Is this a discovery dispute of some sort? As far as the discovery in this case and why I think the trial court handled it the way that it did was, in this case we submitted our discovery request to the defendant and the defendant unequivocally stated that there were no preserved text messages. Further, as it relates to So did you bring this up before Judge Osteen? Yes. And what did you ask him to do? Your Honor, we asked for the appropriate sanction or for the default judgment. And he didn't give that to you? He did not. And the reason that further discovery I believe would not be appropriate and why the judge went to determination of the ultimate sanction to be imposed or not is that additionally we did take the depositions of the other alleged co-conspirators and requested production of documents including Todd Stewart. Judge Osteen has a very high sense of probity. He senses something was wrong. Don't you think he would have been on top of it? Well, I think he does assess, and that's my point, Your Honor. I think he does assess that it was improper for the defendants to destroy these text messages and that they are, unlike a case where this is sort of a tangential issue, this goes to the core issue in this case as to what was indicated between these co-conspirators. And I think when you look at, for example, Judge Traxler, when he decided the Silvestri v. GM case where there was simply a complete lack of, in that case, I believe it was a car that had been destroyed and not preserved for GM to review in that case. As in that case, there is no way, as has been indicated and established with the trial court, for these text messages to come back on the core probative issue in this case of what it was that these defendants were communicating amongst each other. Excuse me. No, you go ahead. Let me ask you this. When you start your argument off on the question of spoliation and, in effect, saying, well, I didn't have all the evidence I was entitled to, implicit with using that argument to begin with is there wasn't enough evidence on the other issues and that you really can't win because you didn't have enough evidence then, and this evidence is essential for you to have a successful case. Well, I think it's important to talk about in terms of what is the threshold issue of what is the evidence in order to apply it to the mechanics of the summary judgment. That's why I started there. I have a basic question here, and that is, why would we just storm into this whole area of agent representation of pro football players? It seems to me that a large part of this issue should be left to NCAA regulations for the time that Mr. Quinn and Mr. Peppers were in college football, and then after that it should be left to NFL regulations and the NFL collective bargaining agreement. I mean, I'm just reluctant to see. Sometimes, you know, judges need to know what they might want to not storm in on, and we're trying to get into the middle of an area that's already heavily policed by the NFL and by the NCAA, and it just seems to me a high potential for completely screwing it up. Right, and I think that generally when you look at what is the public policy of North Carolina, I think that the issue of whether or not the use of runners, I think, first of all, I would say that the issue that we raise just generally is in the context of runners are not a great thing. Now, beyond that, I do think that... When you're talking about the public policy of North Carolina, you know, they all have suggested that the UDTPA, because it's a treble damage action and it can be misused, should be reserved for extraordinary circumstances, and one of those extraordinary circumstances is when a party has been taken advantage of that is unable to thin for itself. But here you have, you know, two big boys. They're agents. They're both playing the game. They're just competing, but nobody is defenseless in this thing. You've got two agents, and they're, you know, they're competitors, and they're competing, and they're competing in the ring. But a lot of these UDTPA cases are serious when one party, when there's an imbalance of power. But here you have, you know, two people who just want to represent someone, and there's no imbalance of power in this kind of situation. Well, what I would say in response, Judge, is that as it relates to the NFLPA rules, there is a unique circumstance in this case that because of the lockout, the union was decertified and that there was no issue as far as. . . Well, but if they violated the rules against advances or they violated the rules against runners, I'm not at all sure they did given the timelines here. Why wouldn't that. . . The NFL and the NCAA impose sanctions for this, for impermissible behavior all the time, and they did, for example, on Mr. Quinn. I don't think he was allowed to play college football because he was negotiating and accepting payments from agents. But why is the UDTPA the tool we want to use to police this kind of thing? It just seems to me we're going to be out of our depth. I think the point that I'm trying to make is, and I don't necessarily disagree with you under certain circumstances, but when you look at the public policy, you have the NFLPA rules and regulations, which beyond their normal import to that field, which is able to impose its own policies and procedures, when you have a situation where that for a period of time is not in effect, I think the point we're making is that those industry practices, those industry norms still exist as defining what is fair and appropriate competition between the parties. And specifically, you have a party here who undoubtedly used intermediaries to violate a very specific provision, which I think is within the public policy of North Carolina, and that is specifically the prohibition on going after players who are under representation by an agent. And I think when the court derived the public policy and looked at it more broadly in terms of, you know, what are these rules, when did one rule apply, when did it not apply? I want you to play in the game, too. I mean, it's alleged that you gave Mr. Quinn $5,000 in cash and his father a $20,000 check and $125,000 that Mr. Quinn wouldn't have to repay if he remained a client. So you were in the game. Sorry, Your Honor. You were using many of the same tactics. And that's why the context, as for any UDP claim, is so important because when you look at when that money was provided, that money was provided specific to the training and development of a player who is going through the NFL Combine and going through that process to live and be at the highest draft pick possible leading up to the draft. And there's no evidence of anything else, and everyone involved in that would dispute any type of impropriety. When you look at the conduct of the defendant, you're looking at specifically a payment that was made and conduct to go after a represented player immediately before their signing. You mean the advance that was made? If you want to call it that. That advance was made immediately before he is about to sign a $5 million contract. This is not— Aren't the advances made to players all the time in the hope that they're going to hit it big and be able to repay not only the advance, but it's going to be a highly profitable operation. I mean, it's to a player's advantage to receive those advances. Why would we call that an unfair trade practice when many, many players have profited from it? It's to their advantage. Well, and as far as when you step back and look at the conduct, the conduct in question is whether or not the defendant's conduct, as far as whether their actions were unfair in this circumstance, as far as between and looking at what they did in their acts and whether or not there's particular aggravation in how they went about in doing things. And when you look at those things of going after a player who is already represented immediately before signing, providing them with a $100,000 payment for which there is later evidence that there will never be a repayment, you can't just look at these ideas of a position in a vacuum. The thing about these, the way the industry is structured, is that the players can terminate the agency relationship. It will. The situation as it presently is gives the players a degree of options. They can accept the advance. They can terminate the agency relationship. It will. So I would be very, it's unusual to find a UDTPA violation in a market that's structured the way this is, a highly competitive market where relationships are terminable at will and the agent gets the agency fee plus an arbitration fee, both of which I think you got. But this would be an unusual case to take an industry, well not an industry but a playing field or a market which is this full of player choice and designed really to maximize player choice and find UDTPA violations. Anyway, you've got some rebuttal time, and if my colleagues have some questions for you, I'm going to keep you up here. Would you like me to respond to that? We don't have any questions. Would you like me to respond to that or just come back? You have some rebuttal time, some time that you've reserved. Thank you. May it please the Court. My name is Peter Ginsberg. I'm here on behalf of the appellees. There was a reason that Judge Osteen concluded that the appellant's case was based on conjecture and speculation, and that's his words. And I submit that he was benign in that characterization. It was really based on paranoia. And for me to hear yet again in open court these totally specious allegations is not only disturbing on one level but also legally and factually inappropriate. This case involved years of discovery. Eighty percent of the depositions were taken by Mr. Carey's counsel. He maxed out on the written interrogatories that he could serve, and we produced over 6,000 pages of documents in a case that wasn't worthy of that kind of expense. With regard to the text messages, it's important to understand that a renowned firm in North Carolina gave two litigation hold directives to my clients, and they abided by those litigation hold directives. They reviewed every possible text, every possible email, every possible document. Mr. Fleming said in deposition, the counsel emphasized, I didn't review the text. Well, he didn't because, quite frankly, he's technologically challenged. So what he did is he turned over his telephones to a woman who's provided both sworn testimony under oath and an affidavit. She runs the office. She is tech savvy. And she said, I reviewed every single text, and there was nothing that fit, nothing relevant to this dispute. Mr. Fleming ended up turning in his phones as they do on a regular basis, as I don't know whether it's just agents, but people do when there's a new phone on the market. He didn't turn over, he didn't delete, he didn't destroy, he didn't do any of the actions that counsel has shown. But Judge Osteen is nothing if not thorough. He is absolutely thorough and took an enormous amount of time supervising this almost fraternity dispute. Every witness, every witness testified that there were no texts that were responsive, that were relevant. So with regard to the spoliation, I frankly think that Judge Osteen did more for appellants than was necessarily needed. And what he did was he took away from us our ability to deny the existence of communications that counsel alleged there to have been, notwithstanding that every witness swore under oath there were no such texts, be that as it may. That was Judge Osteen's discretion, and he exercised it diligently. And for counsel to suggest that Judge Osteen wasn't careful in that regard is belied by Judge Osteen's opinion. With regard to what this case is all about, what it's about, and it's ironic, Mr. Kerry lied to Mr. Quinn. He didn't disclose to him that he had never negotiated a rookie contract. He didn't disclose to him that his only client was Julius Peppers, who he met, interestingly, when Mr. Kerry was at the UNC African American Studies Department, a job from which either voluntarily or involuntarily he no longer held during the course of this litigation. And Mr. Quinn not only found out that Mr. Kerry had paid off his father to entice Mr. Quinn to come to him as a client, but then offered to pay off Mr. Quinn with 125 forgiveness of loan. Mr. Quinn just frankly decided, as he went to the combine, went through the pre-draft situation, that Mr. Kerry simply wasn't qualified. He didn't have the experience and he didn't have the relationships. So Mr. Kerry terminated, I'm sorry, Mr. Quinn terminated Mr. Kerry and interviewed with a bunch of agents. Now, with regard to, and ultimately chose my client as his agent, with regard to whether this is really appropriate for judicial review, as I think Judge Wilkinson, you noted, Mr. Kerry has already gone through the NFLPA, the union procedures governing agents. He sought hundreds of thousands of dollars in this act for representing Mr. Kerry. And the NFLPA arbitrator, who's been doing this for probably as long as Judge Osteen has been carrying out his duties, gave to Mr. Kerry $17,000 and said that's the worth of the services you gave. That's the end of it. But that wasn't the end of it for Mr. Kerry. In addition to those proceedings, we've been through three different lawsuits with him. And frankly, it's about time for this to be over. There is no public policy that was violated. With regard to the NFLPA regulations, up until 2012, runners were allowed. And Mr. Kerry's counsel has cast aspersions on the term. Runners simply meant that agents had people help recruit players. It's a fact of life that a successful agent is recruiting dozens of players. So they have these people who used to make the initial introductions. It's not a dirty word. Now, it turns out that, in fact, there were runners. There were runners who were doing bad things, and that's why, in 2012, the NFLPA decided to outlaw the use of anyone in recruiting who was not certified by the NFLPA. Was there any evidence that Mr. Stewart acted as a runner after the prohibition was put in place? To the contrary. Mr. Frankel testified and Mr. Fleming testified that when Mr. Stewart wanted to continue to do some work or wanted a job with IMPACT, and Mr. Frankel said no. And he never worked for IMPACT afterwards. And, in fact, there is no evidence that Mr. Stewart was a runner who had any connection to Mr. Kerry. Mr. Stewart did have a connection to Mr. Quinn. Mr. Stewart did have a connection to Marvin Austin. And Marvin Austin was a teammate of Mr. Quinn's. So counsel has speculated that that was- What is there other than you've got two competing agents competing to represent players? It's good to have, from a player's point of view, it's good to have people competing to represent them. They get a better deal by being able to compare options. But what is it other than, I mean, one competitor loses to another competitor and doesn't get to represent somebody he wants? And then you come into court with a UDTPA action, and even though the NFL and NCAA are on to the case, I mean, I don't get it. I think the judiciary is owed an apology for having to spend its time and resources on this case. I think that's exactly right, Your Honor, because counsel characterizes this marketing advance, for instance, as a bribe? Your Honor, it is approved by the NFLPA to give these marketing advances. It was done in writing. It was submitted to the NFLPA, and the NFL approved the marketing advance. So counsel's response is, well, Robert Quinn was playing in St. Louis. There's no way that out of the $125,000 marketing advance, Impact Sports ever would have recouped from its 20% share the $125,000. That is just reflective of Mr. Kerry's lack of knowledge about football. Mr. Quinn was and is a superstar. He will and has already been getting marketing opportunities, and Impact will, in fact, be repaid as it was being repaid during the course of this litigation, and counsel knows that. And furthermore, although this was speculated about but not a certainty, now the St. Louis no longer has a team and Los Angeles does. So it's gone. So Mr. Quinn has moved from a mediocre market to an extraordinarily good market, and there's no longer any doubt that the advance is going to be repaid. We want to thank you for your argument, but we don't need to hear further from you. It's a pleasure to have been here. I appreciate the honor. Thank you very much. Mr. Dolly. Thank you. I understand your speculation, and as it relates to the issue specific to the text and the indication that was made by counsel for respondent regarding there being a litigation hold, I just want to briefly take you through the issues with that and why our concerns are what they are. Number one, the testimony of Mr. Fleming, when he was initially asked, was that he specifically made no effort in any circumstance to preserve the information on his phone prior to trading it in in October of 2013. After that testimony, there was an indication that, in fact, the opposite had occurred and that, in fact, the phone had been reviewed. But you're not meeting my basic point, which is that you've got two agents here fighting it out, both doing the same things, utilizing the same recruitment tools to represent a player, and it seemed to me that Mr. Quinn had plenty of reasons to want to leave Mr. Cary quite apart from Impact. I mean, he had Mr. Austin, his close friend, was represented by Impact, and he liked the job, apparently, that they were doing for him, and Mr. Cary was inexperienced. You know, he'd only represented one NFL player before him, and it seems like he didn't even disclose that to his client. And he thought, I believe, that Mr. Cary was charging him for financial and legal services that other agents were providing for free, and he kept communicating with his parents rather than him, so he was dissatisfied, and he had a lot of reasons to abandon Mr. Cary. He just didn't like the job he was doing for him. And, you know, as opposing counsel said, he interviewed a number of agents, but it was in Mr. Quinn's interest for a lot of reasons not to continue this relationship, irrespective of Impact. And these relationships, I come back to the point, they're terminable as will. They want players. The rules are structured to give players options. The advances are structured to give players options. The at-will nature of the relationship is structured to give players options. Now, you know, I just don't understand why we should just barge into this system, which is carefully structured to give players the right to choose, and come in with our own distortions through a treble damage action. I just can't imagine that. I understand your concerns. However, when you look at the initial affidavit for summary judgment that Robert Quinn submitted and his ultimate testimony that followed, specifically as to every one of those assertions, he testified directly contrary in his deposition, and specifically none of those issues were established as being factually undisputed as it relates to the issues of Mr. Carey's experience, his qualifications, or even the reasons for him leaving, they are all belied by his actual testimony, where he, in fact, testifies to the opposite. And as far as I don't dispute, Your Honor, that competition is a good thing. However, when you have a specific regulation and rule in place, which, sorry, Your Honor. It's not whether Mr. Quinn's reasons for leaving Carey are disputed by you. It's whether Mr. Quinn perceived those as reasons he wanted out. You may dispute Mr. Quinn's judgment in this regard, but it's not your call to make. It's Mr. Quinn's call to make. And if he perceived it, the relationship to be an unfruitful one for him, it doesn't matter whether you try to bring it into dispute. It's not material. I understand, Your Honor. And what I'm talking about specifically in reference to Mr. Quinn's own testimony on that issue. But as it relates to the rules or policy in place that define the competition, the issue of going after and targeting players who are under contract, the policy and the competition specific to that issue is different. And I think that as it relates to the rules and regulations that govern it, I think that on that issue in defining public policy, the trial court did error. And as it relates to the general issue of do we want competition and could at this time that's relevant to this case runners be used. There's an overlay to the regulatory. Not only are the relationships specified to be terminably willed. That's to protect the player. And then to protect the agent. The NFL has a provision that the agent gets the fee for services rendered. That happened here. And that you get a fee that can be awarded in arbitration. That happened here. So there's an overlay that the NFL regulation has put on the entire system. The overlay is designed to protect the player's right to free choice and it's designed to protect the agent's right to compensation, generally through arbitration, for services rendered. Now, we can upset that whole apple cart. It's been calibrated to protect both interests. But you want us to be a, I don't know, some super regulatory board of the system. And the only thing I would say to that, Your Honor, is beyond the terminable at will question is, as has been found in other terminable at will UDTBA cases, the issue of what were the circumstances of that person leaving. Were there established public policies or norms that were violated? Were there issues of bribes, lies, or deceit that were used as tactics to get that player to come over or that business? And I think that's the issue that defines it beyond the question of whether or not it's terminable at will from our perspective. Thank you, Your Honor. We'll come down and recounsel and move into our next case.
judges: J. Harvie Wilkinson III, William B. Traxler Jr., Bruce H. Hendricks